**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Opera Company, | CV 06-988-PHX-JAT |
| Plaintiff, | **ORDER** |
| vs. | |
| AZ Opera Company; John Massaro; Gail Massaro, | |
| Defendants. | |

Pending before this Court is Plaintiff's Motion for Preliminary Injunction (Doc. #3) pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116. The Court now rules on the Motion.

**I.   FACTUAL BACKGROUND**

The Court finds that Arizona Opera Company ("Plaintiff") has established the following facts:

Until recently, Plaintiff has been the only professional producer of opera within the state. It was founded in 1971 under the corporate name Tucson Opera Company. On June 21, 1977, it changed its corporate name to Arizona Opera Company and adopted the trademark and trade name Arizona Opera. In addition to its corporate name, Plaintiff registered Arizona Opera Company as an Arizona trade name with the Arizona Secretary of State and also registered Arizona Opera with the state. (Exh. 2). Plaintiff is also the owner

1  of a federal trademark application for Arizona Opera for "entertainment services in the nature
2  of live musical performances, namely, organizing, producing and presenting live musical,
3  orchestral, and operatic performances; educational services, namely, organizing and
4  conducting classes, lectures, film series, school tours, seminars and workshops in the field
5  of music and opera and distributing materials in connection therewith." (Exh. 3).

6  Plaintiff is now in its 35th season of producing operas, and it usually performs five
7  operas per season in both the Phoenix and Tucson metropolitan areas. It has nearly 8,000
8  subscribers annually, has an operating budget of over $6 million, and spends over $1 million
9  annually promoting its programs. (Exh. 23). Plaintiff has also developed websites at
10 www.azopera.com and www.azopera.org. (Exh. 1). Plaintiff also provides community
11 outreach programs, in which it has been able to reach thousands of students and adults
12 throughout the state. Due to Plaintiff's strong presence in the Tucson and Phoenix areas, the
13 public recognizes Plaintiff's names and trademarks as identifying goods and services
14 originating from one source, Arizona Opera.

15 John Massaro ("Defendant") resigned from his position as Plaintiff's chorus master
16 in September, 2004. (Exh. 100). On January 17, 2006, Defendant registered AZ Opera
17 Company as an Arizona nonprofit corporation. (Exh. 7). On March 8, 2006, Defendant sent
18 Plaintiff a demand letter, in which he insisted that Plaintiff stop infringing his rights in the
19 AZ Opera name. (Exh. 8). On March 10, 2006, Defendant issued a press release announcing
20 the formation of his new opera company under the AZ Opera name and mark. (Exh. 9). At
21 least five recipients of Defendant's press release wrote e-mails to Defendant in which they
22 stated that his use of the AZ Opera name would be confusing. (Exh. 10). James Reel, who
23 writes a column called "Cue Sheet" at *www.kuatfm.org*, called Defendant's selection of the
24 name "deliberately confusing." (Exh. 11).

25 Plaintiff, through its counsel, replied to Defendant's demand by alerting him to its
26 rights in the Arizona Opera Company and Arizona Opera names and marks. (Exh. 12). It
27 insisted that Defendant change his corporate name from AZ Opera Company and agree not
28 to use AZ Opera Company, AZ Opera, or any colorable imitation thereof. In a March 15,

1  2006 reply, Defendant offered to change the name of his company due to his concern for the
2  closeness of the names. (Exh. 13).

3  Plaintiff, through its counsel, offered to facilitate the name change. However,
4  Defendant's final correspondence on March 18, 2006 made it clear that he did not intend to
5  change the name of his corporation unless Plaintiff bought the rights from him. (Exh. 15).
6  Due to Defendant's refusal to change the name of his corporation, Plaintiff brought the
7  present suit and filed this pending Motion for Preliminary Injunction.

8  **II.    LEGAL ANALYSIS AND CONCLUSION**

9  To obtain a preliminary injunction, the moving party must show: (a) a strong
10 likelihood of success on the merits, (b) the possibility of irreparable injury to the moving
11 party if injunctive relief is not granted, (c) a balance of hardships favoring the moving party,
12 and (d) in certain cases, advancement of the public interest. *Dollar Rent A Car v. Travelers*
13 *Indem. Co.*, 774 F.2d 1371, 1374 (9th Cir. 1985). Alternatively, preliminary injunctive relief
14 is available to a party who demonstrates either: (1) a combination of probable success on the
15 merits and the possibility of irreparable harm, or (2) that serious questions are raised and the
16 balance of hardships tips in its favor. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th
17 Cir. 1984) (quoting *William Inglis & Sons Banking Co. v. ITT Continental Banking Co.*, 526
18 F.2d 86, 88 (9th Cir. 1975)).

19 **A. Likelihood of Success on the Merits**

20 The Lanham Act § 43, 15 U.S.C. § 1125(a) (2006), creates civil liability for the
21 infringement of all trademarks, whether registered or not. *Levi Strauss & Co. v. Blue Bell,*
22 *Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). To establish a trademark infringement, Plaintiff
23 must demonstrate that: (1) its mark is valid, (2) its mark is the senior mark, and (3)
24 Defendant's mark is likely to cause confusion in the marketplace. *Brookfield Commc'ns, Inc.*
25 *v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

26 Plaintiff must first and fundamentally prove that Arizona Opera is a valid and
27 protectable mark. Trademark law groups marks into four categories: "(1) generic, (2)
28 descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Filipino Yellow Pages v. Asian*

1 *Journal Publications, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (internal quotation marks
2 omitted). Descriptive marks describe a person, place, or an attribute of a product. *Id.* A
3 geographic name is generally descriptive, and thus is considered under the descriptive mark
4 category. *See California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir.
5 1985). Because descriptive marks tend to consist of common words that might be the only
6 way to describe a category of goods, exclusive property rights are not granted in them. *Id.*
7 However, a descriptive mark can become protectable "provided that it has acquired
8 'secondary meaning' in the minds of consumers, i.e., it has become distinctive of the
9 trademark applicant's goods in commerce." *Id.* at 1147. To determine whether a descriptive
10 mark has a secondary meaning, a finder of fact considers: "(1) whether the actual purchasers
11 of the product bearing the claimed trademark associate the trademark with the producer, (2)
12 the degree and manner of advertising under the claimed trademark, (3) the length and manner
13 of use of the claimed trademark, and (4) whether the use of the claimed trademark has been
14 exclusive." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996).
15 　　In *California Cooler,* the plaintiff manufactured and marketed wine coolers known
16 as "California Coolers." 774 F.2d at 1453. Similarly, the defendant manufactured and
17 marketed wine coolers known as "California Special Coolers." *Id.* The plaintiff filed suit
18 against the defendant, alleging trademark infringement. *Id.* The defendant argued that neither
19 the word "California" nor the word "cooler" alone could qualify as valid marks. *Id.* at 1455.
20 The court stated, however, that Plaintiff's mark, "California Cooler," was a composite term.
21 Thus, its validity should not be judged by the examination of its parts but rather by looking
22 at the trademark as a whole. *Id.* The court then stated that "California Cooler" had
23 established secondary meaning in the marketplace because consumers recognized "California
24 Cooler" as a brand of wine cooler. *Id.* at 1456. Additionally, the plaintiff used the term
25 exclusively for almost three years prior to the defendant's adoption of "California Special
26 Cooler." *Id.* Thus, the court stated that "California Cooler" constituted a valid and
27 protectable mark. *Id.*
28

1    In this case, the trademark Arizona Opera is at issue. Arizona Opera is a descriptive
2  mark, and thus it can constitute a valid mark only if secondary meaning has been established.
3  Secondary meaning is likely to be established in this case. First, the public recognizes
4  Plaintiff's trademark as identifying goods originating from one source, Arizona Opera.
5  Additionally, Plaintiff employs numerous advertising techniques under the Arizona Opera
6  trademark and spends over $1 million each year marketing Arizona Opera Company.
7  Furthermore, Plaintiff has been using the Arizona Opera trademark for almost thirty years.
8  Thus, the elements stated in *Comm. for Idaho's High Desert, Inc.* are satisfied. Therefore,
9  secondary meaning has likely been established. For purposes of determining the likelihood
10 of success on the merits for purposes of obtaining a preliminary injunction, it would appear
11 that Arizona Opera is a valid trademark.

12   After proving that the mark is valid, Plaintiff must prove that its mark is the senior
13 mark in order to succeed on the merits. "The first to use a mark is deemed the 'senior' user."
14 *Brookfield Commc'ns*, 174 F.3d at 1047. Plaintiff began using the trademark Arizona Opera
15 on June 21, 1977, while Defendant did not adopt the trademark AZ Opera until January 17,
16 2006. Thus, Plaintiff's mark is the senior mark.

17   Finally, in order for Plaintiff to succeed on the merits, it must prove that Defendant's
18 mark is likely to cause confusion in the marketplace. The court in *AMF Inc. v. Sleekcraft*
19 *Boats* developed eight factors to determine the likelihood of confusion. 599 F.2d 341, 348-49
20 (9th Cir. 1979). The *Sleekcraft* factors are: "(1) strength of the mark; (2) proximity of the
21 goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels
22 used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7)
23 defendant's intent in selecting the mark; and (8) likelihood of expansion of the product
24 lines." *Id.*

25
26   **1. Strength of the Mark**
27   "The strength of a mark is determined by its placement on a continuum of marks." *E*
28 *& J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir. 1992). The strongest

1  marks are arbitrary or fanciful, and they receive the maximum trademark protection. Id.  The
2  weakest marks, which are entitled to no protection, are generic marks.  Descriptive marks lie
3  in the middle of the continuum. *Id.*  Although descriptive marks are inherently weak, they
4  may be strengthened by such factors as advertising, length of exclusive use, and public
5  recognition. *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir. 1989).  As
6  this Court stated above, Plaintiff has engaged in extensive advertising using the Arizona
7  Opera mark for almost thirty years.  Additionally, members of the public, including
8  Plaintiff's 8,000 subscribers, recognize that the operas in Arizona have been produced
9  exclusively by Arizona Opera Company until recently.  Thus, Plaintiff has sufficiently
10 strengthened its mark, causing this factor to weigh in favor of finding likely confusion.

### 2. Proximity of the Goods

12 "Related goods are those products which would reasonably be thought by the buying
13 public to come from the same source if sold under the same name." *Sleekcraft*, 599 F.2d at
14 348.  Plaintiff has produced opera under the Arizona Opera mark for almost thirty years,
15 while Defendant has recently announced his intention to produce opera in Phoenix under the
16 AZ Opera mark.  Because Plaintiff and Defendant are both producing the same product,
17 opera performances, the public will likely think that Defendant's operas are being produced
18 by Plaintiff.  Therefore, this factor also weighs in favor of finding likely confusion in the
19 marketplace.

### 3. Similarity of the Marks

21 "Obviously the greater the similarity between the two marks, the greater the likelihood
22 of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).
23 When applying the similarity analysis, similarity is best judged by appearance, sound, and
24 meaning. *Id.*  The two marks, Arizona Opera and AZ Opera, visually appear very similar.
25 The only difference between the two marks is that Defendant uses the abbreviation for
26 Arizona, rather than the actual word.  When the two marks are said aloud, they sound
27 identical if the abbreviation for Arizona is spoken as the word for which it stands.

1  Additionally, "Arizona" and "AZ" have the same meaning. Due to the great degree of
2  similarity between the two marks, confusion is likely to result.

### 4. Actual Confusion

*Sleekcraft* noted that the absence of evidence of actual confusion can be weighed heavily "when the particular circumstances indicate that such evidence should have been available." 599 F.2d at 353. Following Defendant's press release announcing the formation of his new opera company, AZ Opera, several people noted that his company name might cause confusion. At least five recipients of Defendant's press release wrote to him stating that his use of the name AZ Opera would be confusing. Additionally, James Reel, a columnist, wrote that Defendant's selection of AZ Opera was "deliberately confusing." This evidence does not show actual confusion but rather shows that possible confusion is likely to result in the future. However, it is difficult to have evidence of actual confusion at the present time because Defendant only recently announced his intention to produce opera under the AZ Opera name. He has yet to enter into any contracts or produce any operas with his new company. Thus, while there is no evidence of actual confusion yet, this factor does not weigh heavily against finding that confusion is likely to result because Defendant has only recently adopted a similar mark.

### 5. Marketing Channels

Plaintiff and Defendant appear to be using similar marketing channels. Plaintiff uses various print sources and the Internet to market its company to the general public in both Phoenix and Tucson. Similarly, Defendant will likely use various print sources to market to the general public throughout Phoenix, as evidenced by his first press release, because his company will serve the Phoenix metropolitan community. Therefore, this factor weighs in favor of finding likely confusion because Plaintiff and Defendant are using similar names to market the same product in similar marketing channels.

### 6. Degree of Care Exercised by Consumers

"When the buyer has expertise in the field a higher standard [of care] is proper though it will not preclude a finding that confusion is likely." *Sleekcraft*, 599 F.2d at 353. The

- 7 -

1  majority of opera patrons are sophisticated in their knowledge of the arts and will likely use
2  a moderate degree of care when choosing an opera to attend.  However, due to the similarity
3  between the marks Arizona Opera and AZ Opera, even a sophisticated person might not be
4  able to distinguish between the two names.  Thus, this factor weighs in favor of finding that
5  confusion will likely result because even the utmost care might not prevent confusion.

### 7. Intent to Deceive

7  "When the alleged infringer knowingly adopts a mark similar to another's, reviewing
8  courts presume that the defendant can accomplish his purpose: that is, that the public will be
9  deceived." *Sleekcraft*, 599 F.2d at 354.  Because Defendant is Plaintiff's former chorus
10 master, there is no doubt that he was aware of the presence of the name Arizona Opera in the
11 market.  Because Defendant knowingly adopted a mark similar to Plaintiff's mark, this Court
12 presumes that Defendant intended to deceive the public.  Thus, this factor weighs in favor
13 of finding a likelihood of confusion.

### 8. Expansion of Product Lines

15 "The likelihood of expansion in product lines factor is relatively unimportant where
16 two companies already compete to a significant extent." *Brookfield Commc'ns,* 174 F.3d at
17 1060.  Because Plaintiff and Defendant are in direct competition with one another in the
18 Phoenix metropolitan area, it is not necessary to evaluate whether there is a likelihood of
19 expansion of their product lines.

### Conclusion - Likelihood of Success on the Merits

21 It appears likely that Plaintiff will be able to prove that it has a valid mark, that it is
22 the senior user of the mark, and that Defendant's mark is likely to cause confusion in the
23 marketplace.  Thus, Plaintiff will likely be able to succeed on the merits of its trademark
24 infringement claim.

### B. Possibility of Irreparable Injury to the Moving Party

26 Once the plaintiff in an infringement action has established a likelihood of confusion,
27 it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does
28 not issue.  *See Apple Computer, Inc. v. Formula Intern, Inc.*, 725 F.2d 521, 526 (9th Cir.

- 8 -

1984). Irreparable harm is presumed because continuing infringement would result in the loss of control of reputation and loss of goodwill. *Id.* In this case, Defendant might potentially offer inferior opera performances under the AZ Opera name. If the public assumes that Plaintiff, rather than Defendant, is producing these inferior performances, the goodwill and reputation that Plaintiff has built up over the last 30 years will be harmed. Additionally, costume designers, musicians, singers, set designers, banks, and lenders could easily be misled into believing that they are dealing with Plaintiff. Thus, Plaintiff, due to its showing of a likelihood of confusion, will be irreparably harmed if a preliminary injunction is not granted.

Because Plaintiff has proven the likelihood of success on the merits and the possibility of irreparable harm if injunctive relief is not granted, a preliminary injunction will be granted.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction is granted and that Defendants, their agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, are preliminarily enjoined until trial from doing the following:

a) using any name or mark that contains "Arizona Opera," "AZ Opera," and/or any colorable imitations thereof, in advertising, promoting, marketing, offering for sale, or providing any goods, services or information or in any other way, including but not limited to as a corporate name;

b) taking any action calculated or likely to induce the belief that Defendants and/or their goods or services are in any way associated, connected, affiliated, licensed, or authorized by Arizona Opera;

c) taking any action likely to dilute, tarnish, or blur the distinctiveness of the Arizona Opera Company or Arizona Opera marks.

**IT IS FURTHER ORDERED** that this Order shall take effect immediately upon Plaintiff's posting with the Clerk of Court a bond in the amount of $1,000.00.

**IT IS FURTHER ORDERED** that the Clerk of Court shall accept the bond filed by Plaintiff in the amount of $1,000.00 in the federal registry.

DATED this 14th day of July, 2006.

James A. Teilborg
United States District Judge